# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

**A.G and N.H.**

*Plaintiffs*,

**v.**

**UNITED STATES OF AMERICA,**
SERVE:

Federal Bureau of Prisons
320 First Street, NW
Washington, DC 20534

Federal Tort Claims Act Section
Tort Branch, Civil Division
U.S. Department of Justice
950 Pennsylvania Ave. NW
Washington, DC 20530-0001

U.S. Attorney's Office
Civil Process Clerk
555 Fourth St. NW
Washington, DC 20530

U.S. Attorney General Bondi
U.S. Department of Justice
950 Pennsylvania Ave. NW
Washington, DC 20530-0001

**and**

**BETH REESE, in her individual capacity,**
Bureau of Prisons
Central Office HQ
320 First Street, NW
Washington, DC 20534

*Defendants.*

Civil Action No.

## COMPLAINT

## INTRODUCTION

1. A.G. and N.H.[1] are two women who were incarcerated at FMC Carswell in 2019 and 2020 where they were groomed and sexually assaulted by Correctional Officer Mark Brown, one of a long-line of FMC Carswell staff members who were able to sexually abuse women with impunity.

2. Due to failures throughout the chain of command of the BOP, especially at the Office of Internal Affairs which failed to adequately investigate officers for sexual abuse, including Officer Brown's flagrant sexually inappropriate behavior, sexual predators have been free to prey upon the women whose safety they were tasked to ensure.

3. The BOP leadership, including Ms. Reese, have been aware of the culture of sexual abuse throughout the agency and specifically at FMC Carswell—where people in their care had been reporting sexual abuse by officers for years—and yet did nothing to meaningfully respond or otherwise protect the people incarcerated there.

4. As a direct result of these failures, A.G. and N.H. were sexually assaulted and raped, then threatened with retaliation if they were to report the abuse.

5. A.G. and N.H. both suffer from ongoing trauma because of the sexual violence, mental torment, and retaliation. Their symptoms each include insomnia, chronic nightmares, anxiety, flashbacks, and depression. They remain in the custody of the BOP and fear continual assault by those responsible for their care.

---

[1] Both prisoners have submitted a concurrent motion to proceed under pseudonyms for fear of retaliation and privacy reasons.

6. Plaintiffs bring this suit under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671, *et seq*., and under the Trafficking Victims Protection Reauthorization Act ("TVPRA"),

7. 18 U.S.C. § 1581, *et seq.,* in connection with the deficient supervision and custodial care provided to them by various personnel, including Officer Brown, and the Officer of Internal Affairs, within the scope of their employment with the BOP. Plaintiffs seek redress for Defendants' unlawful conduct, which caused them to suffer permanent and catastrophic injuries and which could have and should have been prevented.

## JURISDICTION AND VENUE

8. This action involves claims arising under United States and District of Columbia laws. The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1332, 1346(b)(1), 1367, and 1343(a)(4),

9. Venue is proper in this district under 28 U.S.C. § 1391 because acts or omissions giving rise to the claims occurred in this district, and under 28 U.S.C. § 1391(3) because the individual Defendant is subject to this Court's personal jurisdiction.

## PARTIES

10. Plaintiff A.G. was, in 2019 and 2020, incarcerated in BOP facilities including FMC Carswell. She is currently incarcerated at FPC Bryan in Bryan, Texas.

11. Plaintiff N.H. was, in 2019 and 2020, incarcerated in BOP facilities including FMC Carswell, in Fort Worth, Texas. She remains incarcerated at FMC Carswell.

12. The Defendant United States of America is liable for the tortious acts of its employees in accordance with the FTCA and is the appropriate Defendant for Plaintiffs' claims under the FTCA. The United States is a sovereign entity that has waived immunity for certain

claims, and is liable for the acts or omissions of its agents, servants, contractors, and employees that occur with the scope of their employment.

13. The BOP is a component of Defendant United States's Department of Justice. The BOP operates and is in possession and control of the Federal Medical Center Carswell. FMC Carswell is a federal female medical correctional institution providing special medical and mental health needs.

14. At all times relevant hereto, Defendant United States acting through the BOP, was responsible for the operation, control, supervision, policy, practice, implementation, and conduct of all BOP matters including at FMC Carswell and responsible for the hiring, retention, training, supervision, management, discipline, and conduct of all BOP personnel, including, but not limited to, Officer Brown and Defendant Reese, and the operation of the Office of Internal Affairs which is supposed to investigate staff misconduct.

15. Defendant Beth Reese is Chief of the Office of Internal Affairs for the BOP.

16. She has held that role since May 2018.

17. Her duty station is in the Central Office in Washington, DC.

18. As chief of the Office of Internal Affairs, Ms. Reese is tasked with overseeing and properly responding to allegations of staff misconduct.

19. She has responsibilities for ensuring that investigations conducted by her office move forward and are completed in a timely manner.

20. These responsibilities include, but are not limited to, training and policy development regarding the office's handling of sexual misconduct allegations, reviewing retaliation allegations and determining whether to have a local investigator or someone from the

Central Office further review the matter, reviewing local allegations and referring it to the appropriate local OIG field office, and tracking and maintaining awareness of investigations handled by the OIG.[2]

21. While acting and failing to act as alleged herein, Defendants had complete custody and total control of A.G. and N.H.

22. A.G. and N.H. were dependent upon Defendants for their personal security and necessities.

23. In performing the acts and omissions contained herein, Defendants, and each of its employees, acted under color of federal law, each acted maliciously, callously, intentionally, recklessly, with gross negligence, and with deliberate indifference to the rights and personal security of Plaintiffs. Each of them knew or should have known that their conduct, attitudes, actions, and omissions were, and are, a threat to Plaintiffs and to their constitutionally, statutorily, and common law protected rights. Despite this knowledge, Defendants failed to take steps to protect Plaintiffs and to ensure their rights to safety from sexual assault.

24. Defendant United States is liable for the tortious acts of its employees as well as their negligent failure to properly investigate. At all times relevant hereto, Defendant Reese and Correctional Officer Brown, were acting within the course and scope of their employment and was within the scope of their authority, whether actual or apparent. Accordingly, each of them is jointly and severally liable to Plaintiff.

---

[2] Transcript of Evidentiary Hr'g at 25, 28, 37, 59, 61, *Cal. Coal. for Women Prisoners v. United States of America Fed. Bureau of Prisons*, (2024) (No. CV 23-04155-YGR).

## THERE IS A KNOWN AND LONG-STANDING HISTORY OF SEXUAL ABUSE AT FMC CARSWELL

25. Sexual abuse by correctional officers and other prison staff at BOP facilities in the United States has been documented for decades.

26. Most recently, the DOJ's own internal investigations, following the revelation of rampant abuse at FCI Dublin, identified that nearly two thirds of BOP facilities have documented sexual abuse allegations, including FMC Carswell.[3]

27. None of this documentation, tragically, is new.

28. Defendants have not taken proper steps to make sure the abuse is not repeated.

29. In 1999, Amnesty International published a report titled "*Not part of my sentence: Violations of the human rights of women in custody*."

30. That Amnesty Report detailed:

> Many women in prisons and jails in the USA are victims of sexual abuse by staff, including sexually offensive language; male staff touching inmates' breasts and genitals when conducting searches; male staff watching inmates while they are naked; and rape.[4]

31. The Amnesty Report was widely circulated and read by responsible corrections professionals.

---

[3] *See* U.S. Senate Permanent Subcommittee on Investigations, "Sexual Abuse of Female Inmates in Federal Prisons" (Dec. 13, 2022), https://www.ossoff.senate.gov/wp-content/uploads/2022/12/PSI-Embargoed-Staff-Report-re-Sexual-Abuse-of-Female-Inmates-in-Federal-Prisons.pdf at 88.

[4] Amnesty International, *Not part of my sentence: Violations of the human rights of women in custody,* available at https://www.amnesty.org/en/documents/amr51/001/1999/en/.

32. The Amnesty Report found that FMC Carswell in particular "has been plagued with systemic sexual abuse for years," revealing hundreds of pages of incident reports, federal records, and court documents documenting a pattern of sexual misconduct and cover-ups.

33. Since 1997, at least 12 correctional staff at FMC Carswell have been convicted of sexual abuse that occurred while at FMC Carswell.

34. In 2004, FMC Carswell officer Michael Lawrence Miller was found guilty of 5 counts of assault, abusive sexual contact with a ward, abusive sexual contact, sexual abuse of a ward, and aggravated sexual abuse.[5]

35. In 2008, an FMC Carswell chaplain was sentenced to four years in prison for sexually abusing women in his custody.[6]

36. One prisoner reported abuses that occurred in 2011, 2012, 2015, 2017, and 2018. These abuses included rape committed by two federal officers, who also beat her unconscious and attacked her with a burning liquid after she reported the rape.[7]

37. From 2012 to 2021, the BOP Office of Internal Affairs substantiated at least 16 cases of BOP staff sexually abusing women incarcerated at FMC Carswell, almost all before Officer Brown raped Plaintiffs.[8]

---

[5] Michael Rigby, Sexual Predation Rampant at FMC-Carswell; Another Employee Convicted, Prison Legal News, May 15, 2007, https://www.prisonlegalnews.org/news/2007/may/15/sexual-predation-rampant-at-fmc-carswell-another-employee-convicted/.

[6] *Priest Who Sexually Abused Inmates at FMC Carswell in Fort Worth Sentenced to 4 Years in Federal Prison,* US DOJ OIG, May 5, 2008, https://oig.justice.gov/sites/default/files/2020-05/2008-05-05.pdf.

[7] Kaley Johnson, *Pakistani prisoner beaten and sexually assaulted in Fort Worth federal prison, lawsuit says*, KERA NEWS, Sept. 25, 2024, https://www.keranews.org/criminal-justice/2024-09-25/aafia-siddiqui-carswell-pakistani-prisoner-sexual-assault-fort-worth-federal-prison-lawsuit.

[8] *Sexual Abuse of Female Inmates in Federal Prison*, United States Senate, Dec. 13, 2022, https://www.hsgac.senate.gov/wp-content/uploads/imo/media/doc/2022-12-

38. In 2016, BOP employee Matthew McGaugh began sexually abusing an incarcerated woman under his custody. She reported him but faced constant retaliation. He was convicted in 2017.[9]

39. In 2021, Lieutenant Luis Curiel sexually abused three women. He was reported in June or July 2021 by another staff member, yet was allowed to remain working at FMC Carswell, where he continued sexually assaulting prisoners. He pled guilty to two counts of sexual abuse and admitted in the criminal prosecution that he had sexually abused three women under his custody at FMC Carswell. As a lieutenant, he supervised other officers, thereby demonstrating that this behavior was not only acceptable, but was permitted by Defendants.[10]

40. A BOP staff member who worked at FMC Carswell described the prison as "the perfect place for sexual misconduct," but remained anonymous for fear of retaliation. This same officer had previously reported a lieutenant for exchanging drugs for sex and was subsequently retaliated against and fired. [11]

41. In the PREA (Prison Rape Elimination Act) Audit Report at FMC Carswell conducted in the beginning of 2022, it was noted that in just the previous 12 months, 9 officers were referred for criminal prosecution for sexually assaulting a prisoner.[12]

---

13%20PSI%20Staff%20Report%20-%20Sexual%20Abuse%20of%20Female%20Inmates%20in%20Federal%20Prisons.pdf

[9] *Former BOP Employee Sentenced for Engaging in Sexual Acts with Inmate*, USAO Press Release, Nov. 7, 2017, https://www.justice.gov/usao-ndtx/pr/former-bop-employee-sentenced-engaging-sexual-acts-inmate.

[10] *See United States v. Luise Curiel*, 4-22-cr-00132 (N.D.T.X) 2022.

[11] *See*, supra, fn 4

[12] Robert Palmquist, Prison Rape Elimination Act Audit Report, Apr. 6, 2022, https://www.bop.gov/locations/institutions/crw/crw_prea.pdf.

42. From 2014 to 2018, 35 women at the FMC Carswell reported sexual abuse from staff members. This number was the highest rate of reported sexual abuse of any federal women's prison, until recent news about FCI Dublin.

43. The true number of assaults that occurred over this period at FMC Carswell is likely worse than records indicate because many prisoners don't report sexual assaults for fear of retaliation.

44. Undersigned counsel alone represent nine women who reported sexual abuse at FMC Carswell, who are not represented in the number above.

45. Despite the audits, lawsuits, and criminal referrals, the abuse has continued and Defendants failed to take appropriate action to prevent abuse, such as that experienced by A.G. and N.H., and continued to allow male staff to spend significant amount of time alone and unsupervised with incarcerated women at FMC Carswell.

46. The culture of sexual abuse whereby Defendants failed to investigate allegations of sexual abuse, document, track, or reprimand known sexual predators, and otherwise monitor and protect prisoners at FMC Carswell—and across BOP facilities— directly led to A.G. and N.H.'s abuse.

## DEFENDANTS KNEW OF, AND FAILED TO PROPERLY ADDRESS, SEXUAL VIOLENCE RAMPANT ACROSS THE BOP.

47. Sexual abuse by staff at BOP women's prisons has not been limited to FMC Carswell.

48. It occurs across BOP facilities across the country.

49. Despite the knowledge that correctional staff sexually abuse prisoners in their custody, Defendants continue failing to take appropriate steps to protect those in its custody.

50. In 2007, five former corrections officers were convicted on criminal charges relating to the sexual abuse of female prisoners at FCI Tallahassee.

51. A 2021 lawsuit filed by four plaintiffs revealed sexual abuse by an FCI Tallahassee physician assistant.[13] Before this action, the same physician assistant was named in at least four civil suits alleging sexual abuse.[14] Another former officer at FCI Tallahassee received a two-year prison sentence for the sexual abuse of a prisoner.[15] The victim in this case also filed a civil lawsuit, which named a second FCI Tallahassee guard accused of abuse, which, settled in 2022.[16]

52. In 2022, a different former corrections officer at FCI Tallahassee was sentenced to prison for four years for the sexual abuse of a prisoner while working at the facility. His indictment included charges related to multiple prisoners. [17]

53. In July 2022, a DOJ working group was tasked to address "reported and proven sexual misconduct by Federal Bureau of Prisons ("BOP") employees" by reviewing the DOJ's approach to monitoring and deterring employee sexual misconduct by looking at the

---

[13] Compl. at 1, *Batchelor et al v. Rolston et al*, No. 4:21-cv-00232-AW-MAF (N.D. Fla. June 4, 2021).

[14] *Id*.

[15] Press Release, United States Attorney's Office for the Northern District of Florida, Former Bureau of Prisons Correctional Officer Sentenced to 24 Months in Federal Prison For Sexually Abusing Inmates (Aug. 27, 2021), https://www.justice.gov/usao-ndfl/pr/former-bureau-prisons-correctional-officer-sentenced-24-months-federal-prison-sexually.

[16] Silja Talvia, *Women Report 'Rampant' Sexual Abuse at Federal Prison Where Ghislaine Maxwell is Held,* THE APPEAL, Apr. 25, 2023, https://theappeal.org/fci-tallahassee-sexual-abuse-women-prison-ghislaine-maxwell/.

[17] Christopher Cann, *Former Tallahassee correctional officer sentenced to 4 years in prison for sexually abusing inmate*, TALLAHASSEE DEMOCRAT, Mar. 11, 2022, https://www.tallahassee.com/story/news/2022/03/11/former-tallahassee-correctional-officer-sentenced-4-years-prison-for-abusing-inmate-leon-county/6984207001/.

"hundreds of [incidents of] sexual abuse perpetrated by its employees over the previous five years."[18]

54. The working group noted long-standing, pervasive problems throughout the BOP that needed fixing. This working group learned of long-standing insufficient reporting mechanisms, "flawed investigations," and examples of "inadequate administrative sanctions and initial prosecutorial declinations for employees ultimately convicted of egregious misconduct."[19]

55. Additionally, it determined that there needed to be changes to the "culture and environment in BOP facilities" to address the rampant sexual violence.[20]

56. The working group found that "advocates and formerly incarcerated women identified several obstacles to reporting sexual abuse, including a fear of not being believed, a fear of retaliation, and a fear that reporting would not result in consequences for the perpetrator."

57. The working group found that "formerly incarcerated individuals reported that corrections officers have threatened retaliation against reporting individuals, including by restricting access to children."

58. One particular problem it found was that, until the early 2020s, "SIS officers were encouraged during initial intake interviews to obtain from victims sworn declarations in writing under penalty of perjury, presumably for a later administrative investigation."

---

[18] The Principal Associate Deputy Attorney General Working Group of DOJ Components, *Report and Recommendations Concerning the Department of Justice's Response to Sexual Misconduct by Employees of the Federal Bureau of Prisons*, Nov. 2, 2022, https://www.justice.gov/d9/pages/attachments/2022/11/03/2022.11.02_bop_sexual_misconduct_working_group_report.pdf (Working Gp. Rep.).

[19] *Id*.

[20] *Id*.

59. This practice was a problem because "There is no legal requirement for sworn statements or affidavits, and the evidentiary value of these sworn affidavits may be limited. At the same time, requiring such sworn statements run counter to trauma-informed practices and may chill reporting, as it heightens a victim's fear that she may face prosecution if her account is not believed."

60. Finally, the working group noted the problems created by blind spots in many women's prisons and suggested that the "BOP should continue to upgrade camera technology and implementation and, beginning with female institutions, review and expand coverage of currently deployed cameras across BOP systems to eliminate 'blind spots.'"[21]

61. The working group also issued elementary guidance regarding establishing an appropriate tone about sexual misconduct at BOP facilities: "The Director of BOP should issue a message reiterating the gravity of sexual misconduct and expressing that sexual misconduct will not be tolerated."[22]

62. The implication of this guidance given the ongoing and rampant abuse within BOP, is that this message had not been communicated to BOP staff.

63. Additionally, the working group recommended that the BOP develop an "early warning system" in order to detect signs that staff may be engaged in sexual conduct and to identify abusers with a history of abuse.

64. This recommendation again suggests that the BOP was not analyzing the data it did have, allowing sexual predators to move from unit to unit without any systemic tracking or identification.

---

[21] *Id.*

[22] *Id.*

65. Had the Working Group's suggested changes, which flowed directly from the BOP's statutory and common law duties to the prisoners, been in place before 2021, A.G. and N.H. likely would have been saved from these violent assaults.

66. An investigation by the Associated Press published in 2021 unfolded that over a hundred federal prison workers had been convicted or arrested for crimes since 2019, including a drug treatment specialist at Kentucky prison medical center who threatened prisoners' lives if they didn't comply with sexual abuse. [23]

67. The AP reporting also uncovered the Justice Department's failure to adhere to standard practice by not removing or suspending a prison official tasked with investigating staff misconduct, who was the subject of complaints and arrests himself.[24]

68. In October 2022, the DOJ Office of the Inspector General issued a report detailing its concerns over how the BOP had been handling of administrative misconduct investigations and prisoner statements relevant to those investigations. [25]

69. The OIG specifically noted that "The BOP's reluctance to rely on evidence provided by inmates enhances the likelihood that employees who have engaged in misconduct avoid accountability for their actions and remain on staff, thereby posing serious insider threat potential, including the risk of serious harm to inmates." [26]

---

[23] Michael Balsamo, *Workers at federal prisons are committing some of the crimes*, TORONTO STAR, Nov. 14, 2021, https://www.thestar.com/news/world/united-states/workers-at-federal-prisons-are-committing-some-of-the-crimes/article_e52cd284-d095-5caa-8e5f-90173c580ffd.html.

[24] *Id.*

[25] Michael E. Horowitz, *Management Advisory Memorandum: Notification of Concerns Regarding the Federal Bureau of Prisons' (BOP) Treatment of Inmate Statements in Investigations of Alleged Misconduct by BOP Employees*, Oct. 2022, https://oig.justice.gov/sites/default/files/reports/23-001.pdf.

[26] *Id.*

70. The OIG further noted that the BOP's procedures had historically created a problem because "to the extent that the BOP's reluctance to rely on inmate testimony is known to its employees, this reluctance likely emboldens miscreant staff members in their interactions with inmates because such staff members may act without fear of disciplinary consequences." [27]

71. The report explained that the "OIG has serious concerns that that the BOP is reluctant to rely on inmate testimony in administrative misconduct investigations, has a general practice of avoiding calling inmates as witnesses in MSPB and arbitration proceedings, and, at least in matters involving staff on inmate sexual assault, is effectively requiring significantly more proof than necessary under the applicable preponderance of the evidence standard to sustain misconduct and take disciplinary action against BOP employees." [28]

72. In sum "The OIG concluded that this manner of handling misconduct by BOP employees is contrary to federal regulations and BOP policy and creates significant risks for the BOP."[29]

73. Over the last two years, more history of sexual abuse in the BOP has surfaced.

---

[27] *Id.*

[28] *Id.*

[29] Michael E. Horowitz, *Management Advisory Memorandum: Notification of Concerns Regarding the Federal Bureau of Prisons' (BOP) Treatment of Inmate Statements in Investigations of Alleged Misconduct by BOP Employees*, Oct. 2022, https://oig.justice.gov/sites/default/files/reports/23-001.pdf.

74. A 2023 indictment involved the sexual abuse of two prisoners from 2018 through 2019 at Federal Correctional Institution Aliceville, perpetrated by a federal correctional officer.[30]

75. In 2022, a jury convicted a former prison warden at another federal facility afflicted by allegations of abuse, FCI Dublin, of sexually abusing three prisoners from 2019 through 2021 and of making false statements to a government agency in the investigation of criminal acts. Separate from the warden's own sexually abusive behavior, eight FCI Dublin correctional officers were charged with abusing prisoners during this warden's tenure.[31]

76. In 2024, a Special Master Report stemming from litigation surrounding sexual abuse at FCI Dublin unearthed a series of deficiencies at the California facility, some of which "are likely an indication of systemwide issues within the BOP, rather than simply within FCI-Dublin."[32]

77. Among the report's findings detailing the failures of the central BOP office including "the failure of Central Office and Regional Office management to correct significant and longstanding deficiencies that had previously been idenfied [sic] in multiple audits and investigations."[33]

---

[30] Press Release, U.S. Dept. of Justice, Office of the Inspector General, *BOP Correctional Officer Indicted for Sexual Abuse of Inmates*, Apr. 24, 2023, https://oig.justice.gov/news/press-release/bop-correctional-officer-indicted-sexual-abuse-inmates.

[31] *Press Release, Office of Public Affairs, U.S. Dept. of Justice, Former Federal Prison Warden Sentenced for Sexual Abuse of Three Female Inmates, Mar. 22, 2023, https://www.justice.gov/opa/pr/former-federal-prison-warden-sentenced-sexual-abuse-three-female-inmates.*

[32] Wendy Still, *First Report of the Special Master Pursuant to the Court's Order of March 26, 2024*, June 5, 2024, https://static1.squarespace.com/static/64a5d4d138199b2c7c48c3de/t/66d361045918c670b861f4af/1725128967464/FCI+Dublin%2C+Special+Master+Report+%28No+Attachments%29.pdf.

[33] *Id.*

78. The Special Master also found that "Furthermore, management's failure to ensure staff adhered to BOP policy put the health, safety and liberty of AICs [adults in custody] at great risk for many years."[34]

79. In deciding to appoint a Special Master, the Northern District of California determined that that the BOP had knowledge of the sexual abuse at BOP facilities and that leadership of the BOP "has been, and is, deliberately indifferent to plaintiffs' risk of abuse."[35]

80. The Court made that determination because of the delays in action by the BOP Central Office, including, and especially Defendant Reese, who first received complaints of sexual abuse from FCI Dublin in 2019, yet did not start prosecuting these cases until 2021.[36]

81. The Special Master found "numerous operational, policy, and constitutional violations" across the BOP, including the failure of the Central Office.[37]

82. The Special Master also reported that the BOP had "no standard protocol to report violations."[38]

83. The Special Master also found that the "BOP does not use PREA or other data to monitor reports of assault." [39]

---

[34] *Id.*

[35] *Cal. Coal. for Women Prisoners v. United States*, 723 F. Supp. 3d 712, 736 (N.D. Cal. 2024)
[36] *Id.*
[37] *Id.*

[38] *Id.*

[39] *Id.*

84. In short, the long history of the Defendants' mismanagement created the conditions that led directly to A.G. and N.H. being raped and sexually abused by a BOP staff member who had a history of sexually violating prisoners under his care.

## BOP ALLOWED A.G. AND N.H. TO BE SEXUALLY ABUSED WHILE AT FMC CARSWELL BY A KNOWN SEXUAL PREDATOR

**A. Defendants allowed A.G. to be abused in 2019 and 2020.**

85. A.G. arrived to the BOP in 2019 and was immediately sent to FMC Carswell.

86. Upon arrival at FMC Carswell, A.G. was sent to Unit 2 South.

87. She met Officer Brown shortly thereafter.

88. Almost immediately, Officer Brown started flirting with her.

89. Although she was taken aback by and uncomfortable from his behavior, in some ways A.G. appreciated the attention.

90. She also believed she might get into trouble if she didn't also go along with it.

91. Officer Brown also regularly smelled like alcohol and would carry around clear bottles filled with clear liquor.

92. Upon information and belief, other officers would have known that he smelled like alcohol.

93. Officer Brown would ask A.G. personal questions about herself and he shared personal details about his life including information about his children and that he had recently been divorced.

94. Through their conversations, A.G. felt like Officer Brown cared about her and that they might be together after she was released from prison.

95. Towards the end of 2019, Officer Brown's behavior escalated.

96. One evening, A.G. was working as an orderly and needed the orderly closet to be locked by an officer. She told him she needed his help to lock the door. He told her to go on ahead and he followed behind.

97. When A.G. got to the closet, he followed her in. At this point, she understood that he expected something sexual.

98. Officer Brown pulled out his penis from his zipper and forced A.G. to perform oral sex on him. He was aggressive, slamming her head and pulling her hair.

99. She did not want to perform oral sex on him, and she was scared, but he forced her.

100. Then, after several minutes, he stood her up and vaginally penetrated her with his penis.

101. When he finished, he left the closet and she left shortly after.

102. The same incident occurred within the next week. He told her to meet him in the closet and then he followed behind her. He forced her into oral sex and then vaginal penetration.

103. He was aggressive and forceful.

104. The third sexual encounter occurred several weeks after this. Officer Brown told A.G. to meet him in the video visitation room after evening count. She hadn't been there before with him, but she knew it was more private.

105. During this encounter, Officer Brown again forced A.G. to perform oral sex on him and then vaginally penetrated her.

106. A.G. felt scared because she did not feel like she could say no, but she also felt like Officer Brown really cared about her.

107.     The last and final encounter occurred several weeks later. Officer Brown again told A.G. to meet him in the video visitation room after evening count.

108.     After the two were in the video visitation room, however, Officer Brown realized he had locked himself in the room with A.G.

109.     He called the compound officer, Officer Tate, over the radio and told her he needed to be let out of the video visitation room. In this conversation, he said he somehow locked himself in the room.

110.     When Officer Tate arrived to let Officer Brown out, Officer Brown told A.G., who had been there the entire time, to hide under the desk so that Officer Tate would not see her.

111.     Officer Brown left the room and returned about thirty minutes later to let out A.G.

112.     After this incident, Officer Brown was not around the unit as much and A.G. did not interact with him.

113.     At this point, she feared that she might be the one to get in trouble, if she were to report his abuse.

114.     During these months, in 2019 and 2020, in addition to the previously listed sexual encounters, Officer Brown, on several occasions, went into A.G.'s cell alone. In one of these instances, he searched her cell when she remained in her cell, in violation of BOP policy. He then kept a photo of her she had in her locker.

115.     In another instance, Officer Brown came into her cell, alone, and rubbed up against her leg. Her cellmate was in the cell with her, sleeping. He then walked out.

116.     A.G. interacted with Officer Brown much less after this as she was sent to Unit 2 North.

117.    Even though Officer Brown was not assigned to her unit, she knew that he was still working at FMC Carswell and that word traveled quickly amongst staff. As such, she was terrified that she might be retaliated against, sent to the SHU, or receive write-ups if she were to report the sexual abuse.

118.    At some point in early to the middle of 2023, A.G. saw interacted with Officer Brown again. That interaction triggered all the feelings she had intentionally pushed down.

119.    After an SIS officer interviewed A.G. for a separate incident, and requested additional information, telling A.G. that she would be protected if she came forward with anything, A.G. reported Officer Brown.

120.    Given the obviousness with which Officer Brown sexually abused A.G., including entering her cell alone while she was in the cell, bringing her into a closet alone, and bringing her into the video visitation room alone, other BOP personnel suspected, or should have reasonably suspected, that he was sexually abusing her.

121.    In particular, Officer Tate should have suspected, or reasonably suspected, that Officer Brown was engaged in some unsavory conduct when he had locked himself in the video visitation room after count.

122.    Binding PREA regulations mandate staff reporting, where all BOP staff are required to "report immediately . . . **any knowledge, suspicion, or information** regarding an incident of sexual abuse or sexual harassment that occurred in a facility. . .; retaliation against inmates or staff who reported such an incident; and any staff neglect or violation of responsibilities that may have contributed to an incident or retaliation." 28 C.F.R. § 115.61(a) (emphasis added).

123.     When an incarcerated person is subject to a substantial risk of imminent sexual

abuse, BOP shall take immediate action to protect that person. *See* 28 C.F.R. § 115.62.

124.     In addition, administrative investigations of alleged sexual abuse by a staff

member are required to proceed "promptly, thoroughly, and objectively for all

allegations, including third-party and anonymous reports." *Id.* § 115.71(a).

125.     The presumptive disciplinary sanction for substantiated allegations of sexual

abuse is termination. *See id.* § 115.76(b).

126.     Victims shall also be offered medical and mental health care by the BOP. *See id.*

§ 115.83.

127.     Defendant United States and its agents, servants, contractors, and employees had

numerous opportunities to follow those mandates and stop Officer Brown's misconduct.

Officer Brown's actions, including engaging in sexual act with A.G. in the orderly closet,

entering her cell alone, and bringing her to the video visitation room after count, as well

as obviously flirting with and talking with her were abnormal, obvious, and suspicious

for sexual misconduct.

128.     In addition, upon information and belief, correctional officers in the control room

were charged with monitoring the security cameras and following up on any suspicious

activities that they noticed on the cameras.

129.     These officers saw or should have seen that Officer Brown disappeared into

A.G.'s cell, the orderly closet, and the video visitation room with A.G. alone and after

count.

130.     Even so, BOP personnel took no actions to investigate or stop this suspicious and

recurrent behavior.

131.     Defendants and its agents, servants, contractors, and employees failed to investigate, discipline, supervise, monitor, question, or stop Officer Brown despite numerous indications of sexual misconduct including, upon information and belief, from by other incarcerated women.

132.     This violated mandatory BOP policies, was not related to a discretionary function or duty, and served no plausible penological policy purpose.

133.     This failure cannot be explained without deliberate indifference, recklessness, and carelessness of the Defendant United States, Defendant Reese, and its agents, servants, contractors, and employees towards the risk of sexual abuse that incarcerated women face.

134.     Defendants' acts caused A.G. severe mental, physical, and emotional harm and exacerbated all of her already underlying mental health diagnoses.

135.     She has chronic anxiety and has lost trust in the BOP, fearing that she may again be sexually abused.

136.     The foregoing are permanent injuries as a direct result of Defendants' deliberate indifference to Plaintiff's health and safety, Defendants' disregard of the excessive risk of harm to Plaintiff's health and safety, and/or Defendants' negligent failure to promptly protect A.G. from foreseeable assaults.

137.     Upon information and belief, A.G. will require sustained, long-term intensive psychiatric and/or psychological treatment with appropriate qualified experts. Even with such professional treatment, it is expected that A.G.'s injuries and damages are permanent and will continue to severely impact her health, welfare, and daily functioning.

**B. Defendants allowed N.H. to be abused in 2020 and 2021.**

138.     N.H. entered the BOP in September 2018, where she was immediately transferred to FMC Carswell.

139.     N.H. sought out FMC Carswell because of the Life Connections Program, a religious-based program designed to help prisoners develop healthy coping mechanisms and life-style changes.

140.     N.H. was housed on Unit 2 South.

141.     N.H. first met Officer Brown in 2019.

142.     During 2019, Officer Brown worked on different units, but regularly worked on Unit 2 South, so N.H. would often see Officer Brown.

143.     Immediately upon meeting N.H., Officer Brown was friendly and showed an interest in her.

144.     Officer Brown would seek out N.H. and talk with her for hours at a time.

145.     Other staff members would have observed this unusual attention.

146.     Officer Brown would ask N.H. stories about her life, specifically asking questions about sex work, including about people's fetishes and different sexual acts she would perform.

147.     Officer Brown also shared about his life, including information about his children and that he was going through a divorce.

148.     He would bring in items for her like gum and perfume so that she could make additional money since he knew that she had no support on the outside.

149.     He told her that she should apply for a sentence reduction and that when she was released, she should relocate to Texas in order to be with him.

150.     N.H. had a daughter who was in and out of addiction and Officer Brown would regularly look her up on his office computer and tell N.H. information about where she was.

151.     N.H. believed that Officer Brown cared about her.

152.     In fact, his behavior suggests that he groomed her, in order to make her feel comfortable and to trust him.

153.     Throughout 2019 and the beginning of 2020, Officer Brown would regularly rub up against N.H.

154.     For example, she would be sitting down and because of how tall he was, he would walk by her in such a way that his penis would intentionally rub up against her.

155.     In other moments, when they passed each other in the unit, he would rub her hand or graze different parts of her body.

156.     These instances were not accidental, and when they would talk about them at different points in his office, the two would make sexual innuendos.

157.     In 2020, Officer Brown was stationed as the quarterly officer of Unit 2 South.

158.     At some point in the Summer of 2020, as the two were talking in Officer Brown's office, he suggested that N.H. perform oral sex on him at a later date. N.H. agreed.

159.     During this time, the prison was on COVID lockdown.

160.     Only one officer—Officer Brown—worked the unit, as the quarterly officer stationed on the unit, and one other compound officer would come to the different units to assist in conducting count. Once count was complete, only one officer would remain in the unit.

161.     At this time, Unit 2 South had evening count at 9:00 pm.

162.     So, on this date, Officer Brown told N.H. to meet him in the video visitation room after 9:00 pm after count had been conducted.

163.     N.H. first arrived in the video visitation room, followed closely by Officer Brown.

164.     When Officer Brown arrived, he pulled his penis out through the zipper in his pants.

165.     Officer Brown then pushed N.H.'s head down and forced her to perform oral sex on him.

166.     During this encounter, Officer Brown was incredibly aggressive with N.H., grabbing her hair and forcing his penis repeatedly into her mouth.

167.     N.H. had tears running down her face as he forced her to perform oral sex on him.

168.     During this encounter, N.H. said Officer Brown especially reeked of alcohol and that his penis smelled like alcohol and urine, the smell exacerbating the disgust she felt from being forced into this act.

169.     Because of the way that Officer Brown was forceful with N.H., she was cut on the bottom of her lip from the zipper on his pants.

170.     The entire interaction lasted less than a half hour.

171.     Afterwards, N.H. returned to her cell, feeling disgusted and terrible with herself.

172.     From that point on, her interactions with Officer Brown almost immediately changed and he began treating her differently.

173.     Although she continued to see Officer Brown around the unit, he would ignore her and give her the cold shoulder. When he would walk past her, he would walk by slowly and stare menacingly at her. Because of the aggression he had used when he

forced her to perform oral sex on him, she believed that he could and would physically harm her.

174.    Where before, she had felt that he had cared about her, now she felt intimidated by him, that he would and could hurt her, and that he had only used her for sex.

175.    She felt dismissive, ugly, and scared, and this further triggered her past history of sexual abuse.

176.    Because of how worthless she felt and because she believed that reporting the abuse would only get her sent to the SHU and experience retaliation, N.H. blocked out the memory of the assault.

177.    She continued to see Officer Brown around. Although he did not work on her unit as much, he did work on her unit periodically and she still remained terrified of what he might do.

178.    She believed that he might physically assault her or that he, or another officer he was friends with would write her up and have her sent to the SHU.

179.    At some point in 2023, N.H. heard that Officer Brown was no longer at FMC Carswell.

180.    Once she heard that Officer Brown no longer worked at FMC Carswell, N.H. came forward and reported the PREA violation to appropriate staff at FMC Carswell.

181.    During her reporting, she was told that the PREA would remain in confidence. Yet, when she was taken to medical for a PREA screening, the officer who took her loudly announced in front of other individuals that N.H. was there for a PREA screening. She felt embarrassed and ashamed.

182.     This further confirmed her belief that she was going to be retaliated against for reporting the sexual abuse.

183.     In another instance, while she was working in the tool room, she overheard two officers, including the officer to whom she had reported the assaults, discussing this report. N.H. overheard the officers belittling her and talking about how she "wanted it."

184.     This further contributed to the shame she felt and made her regret coming forward.

185.     Only in 2025, after the filing of the Federal Tort Claims Act notice, the SF 95, did N.H. finally receive mental health support from the BOP.

186.     She was allowed six sessions with a therapist at the Women's Center.

187.     N.H. is traumatized as a result of this sexual assault.

188.     Her self-worth has plummeted.

189.     She does not feel safe within the BOP.

190.     At some point in 2024, N.H. was awakened by an officer because she had mail to hand in. She awoke screaming, terrified, thinking that it was Officer Brown.

191.     After N.H. was sexually abused by Officer Brown, she began seeing his body language towards other women—namely reflected in her own experiences with him—and began hearing rumors from other women that Officer Brown was engaged in sexual relationships with many other prisoners, both on her unit as well as on Unit 3 South.

192.     Given the obviousness with which Officer Brown sexually abused N.H., other BOP personnel suspected, or should have reasonably suspected, that he was sexually abusing her.

193.     Binding PREA regulations mandate staff reporting, where all BOP staff are

required to "report immediately . . . **any knowledge, suspicion, or information**

regarding an incident of sexual abuse or sexual harassment that occurred in a facility. . .;

retaliation against inmates or staff who reported such an incident; and any staff neglect or

violation of responsibilities that may have contributed to an incident or retaliation." 28

C.F.R. § 115.61(a) (emphasis added).

194.     When an incarcerated person is subject to a substantial risk of imminent sexual

abuse, BOP shall take immediate action to protect that person. *See* 28 C.F.R. § 115.62.

195.     In addition, administrative investigations of alleged sexual abuse by a staff

member are required to proceed "promptly, thoroughly, and objectively for all

allegations, including third-party and anonymous reports." *Id.* § 115.71(a).

196.     The presumptive disciplinary sanction for substantiated allegations of sexual

abuse is termination. *See id.* § 115.76(b).

197.     Victims shall also be offered medical and mental health care by the BOP. *See id.*

§ 115.83.

198.     Defendant United States and its agents, servants, contractors, and employees had

numerous opportunities to follow those mandates and stop Officer Brown's misconduct.

Officer Brown's actions, including engaging in sexual act with N.H. in the video

visitation room after count, as well as obviously flirting with and talking with her for

hours on end were abnormal, obvious, and suspicious for sexual misconduct.

199.     In addition, upon information and belief, correctional officers in the control room

were charged with monitoring the security cameras and following up on any suspicious

activities that they noticed on the cameras.

200.    These officers saw or should have seen that Officer Brown disappeared into the video visitation room with N.H. alone and after count.

201.    Even so, BOP personnel took no actions to investigate or stop this suspicious and recurrent behavior.

202.    Defendants and its agents, servants, contractors, and employees failed to investigate, discipline, supervise, monitor, question, or stop Officer Brown despite numerous indications of sexual misconduct including, upon information and belief, from by other incarcerated women.

203.    This violated mandatory BOP policies, was not related to a discretionary function or duty, and served no plausible penological policy purpose.

204.    This failure cannot be explained without deliberate indifference, recklessness, and carelessness of the Defendant United States, Defendant Reese, and its agents, servants, contractors, and employees towards the risk of sexual abuse that incarcerated women face.

205.    Defendants' acts caused N.H. severe mental, physical, and emotional harm and exacerbated all of her already underlying mental health diagnoses.

206.    She has chronic insomnia and frequent, recurring nightmares that keep her up. She has lost trust in the BOP and fears that she could experience sexual abuse again at any moment.

207.    The foregoing are permanent injuries as a direct result of Defendants' deliberate indifference to Plaintiff's health and safety, Defendants' disregard of the excessive risk of harm to Plaintiff's health and safety, and/or Defendants' negligent failure to promptly protect N.H. from foreseeable assaults.

208.    Upon information and belief, N.H. will require sustained, long-term intensive psychiatric and/or psychological treatment with appropriate qualified experts. Even with such professional treatment, it is expected that N.H.'s injuries and damages are permanent and will continue to severely impact her health, welfare, and daily functioning.

**C. Another prisoner released in 2021 was also abused by Officer Brown.**

209.    A third woman, referred to here as Jane Doe, was also sexually abused by Officer Brown in 2019 and 2020.

210.    Ms. Doe was also housed in Unit 2 South when Officer Brown worked as the quarterly officer in that unit.

211.    Throughout 2019 and 2020, Officer Brown pressured Ms. Doe to engage in sexual acts, despite her feeling uncomfortable and not wanting to.

212.     From April-July 2020, Ms. Doe was forced to perform oral sex on officer Brown at least 6 times. He also digitally penetrated her and forced her to open her legs for him to look between her legs.

213.    Ms. Doe was able to avoid having vaginal intercourse with him, making excuses each time, but was only able to evade it by performing oral sex on him.

214.    Officer Brown became increasingly more aggressive and forceful

215.    Ms. Doe was released from BOP custody in 2021 and made her daughter immediately change her number because she was scared that Officer Brown would contact her through her daughter's cellphone.

216.    Unfortunately, she failed to report the abuse upon her release from BOP custody. As such, her claims are not entitled to the same equitable tolling as A.G. and N.H.

217.    Ms. Doe's sexual abuse demonstrates how rampant Officer Brown's sexually abusive behavior was and the failure of Defendants to protect prisoners in its custody.


### THESE CLAIMS ARE ENTITLED TO EQUITABLE TOLLING

218.    FTCA claims must be presented to the government within two years of accrual pursuant to 28 U.S.C. §2401(b).

219.    However, FTCA claims are entitled to equitable tolling, thereby extending the statute of limitations, on a case-by-case basis in order to prevent inequity.[40]

220.    A plaintiff must demonstrate that 1) there was some extraordinary circumstance that stood in her way; and 2) she has been pursuing her rights diligently since.[41]

221.    Fear of retaliation, particularly in a context where officers exercise total control over prisoners, amounts to an extraordinary circumstance meriting equitable tolling.[42]

222.    Officers exercise total control over prisoners lives and there are further psychological consequences that go along with that level of control.[43]

223.    Both A.G. and N.H. feared Officer Brown, who had demonstrated aggression against each of them.

---

[40] *United States v. Wong*, 575 U.S. 402, 412 (2015); *Warren v. Garvin*, 219 F. 3d 111, 113 (2d Cir. 2003) SCOTUS???
[41] *Doe v. United States*, 76 F.4th 64, 71, (2d Cir. 2023) (citing *A.Q.C. ex rel. Castillo v. United States*, 656 F.3d 135, 144 (2d Cir. 2001))
[42] *Gabiddon v. Wilson*, 2021 U.S. Dist. LEXIS 29499 at *21 (S.D.W.Va. Feb. 17, 2023)
[43] *Id.* ((citing *Davis v. Jackson*, 2016 U.S. Dist. LEXIS 136034 *32-33 (S.D.N.Y. Sept. 30, 2017) (describing the psychological effects of being totally controlled through imprisonment and the fear of retaliation as a result)).

224.     Plaintiffs had witnessed other women report officers for sexual abuse and be sent to the SHU.

225.     Placement in the SHU could mean loss of privileges including not being able to use the phone or tablet to talk to loved ones on the outside, not being able to go outside freely, and not accessing commissary and other food and hygiene items.

226.     Additionally, upon information and belief, when a prisoner at FMC Carswell is placed in the SHU, all contacts from their tablet and phone are deleted, which does not happen at other BOP facilities.

227.     The process of re-adding contacts to the tablet and phone can be a lengthy one, delaying outside contact even more than the period of SHU confinement.

228.     Write-ups or time in the SHU could result in loss of good time and could increase the length of their sentence.

229.     Prisoners could also be transferred, upon placement in the SHU, or in retaliation by officers.

230.     Both A.G. and N.H. wanted to remain at FMC Carswell to be close to family and because of the programming it offered, respectfully.

231.     Both A.G. and N.H. knew that officers, at any point, could search—or raid—a prisoner's cell.

232.     Invasive cell searches include looking through all items in the cell, throwing papers all over the room, or throwing papers, commissary items, and other products in the trash.

233.     In these retaliatory searches, officers also regularly threw away personal property including letters and photographs from loved ones that are often irreplaceable.

234.        A.G. and N.H. had both seen cell searches used as a form of retaliation.

235.        A.G. and N.H. had both witnessed how officers look out for one another and

protected each other.

236.        As such, neither believed that reporting to any different officer, at least when

Officer Brown was still around, would result in any less retaliation.

237.        District courts could reasonably conclude that both A.G. and N.H. suffered

extraordinary circumstances preventing them from reporting the abuse in a timely

manner.

238.        As noted previously, retaliation and threat of retaliation prevent prisoners from

coming forward and amount to extraordinary circumstances preventing earlier

reporting.[44]

239.        Additionally, Officer Brown was physically aggressive when he forced both A.G.

and N.H. to perform sexual acts.

240.        Neither believed Officer Brown was like that before and the switch in his

character further caused them not to know how he could react to reporting the abuse.

They did not know if he would further assault them upon reporting the abuse sooner.

241.        This type of inconsistency of character is another form of control.

242.        When A.G. and N.H. each learned that Officer Brown no longer worked at FMC

Carswell, they each came forward and reported the abuse, and have been pursuing their

rights diligently since.

---

[44] *See Doe*, 76 F.4th 64 (holding that Plaintiff was entitled to equitable tolling where she had been
sexually abused by an officer and had failed to report the abuse within two years)

243.    Although A.G. and N.H. both feared other officers' responses, believing that Officer Brown was no longer employed made them feel freer.

244.    N.H. reported the abuse in November 2023 and filed her SF 95 on October 31, 2024, within the two-year period of when she was able to report the abuse.

245.    A.G. reported the abuse in July or August 2023 and filed her SF 95 on March 19, 2025, within the two-year period of when she was able to report the abuse.


## FTCA EXHAUSTION

246.    Plaintiffs have properly complied with 28 U.S.C. § 2675 by presenting an Administrative Claim against the United States of America. The Claim was timely filed within two years of the accrual of the causes of action, at the date at which each plaintiff reported the abuse.

247.    BOP denied N.H.'s Administrative Claim on January 15, 2025.

248.    BOP denied A.G.'s Administrative Claim on April 17, 2025

249.    Plaintiffs have filed their pro se complaint in this Court on July 14, 2025, within 6 months of the denials of their Administrative Claims by the BOP.

250.    Therefore, Plaintiffs have exhausted requisite administrative remedies under the Federal Tort Claims Act.

**CAUSES OF ACTION**

**COUNT I – NEGLIGENCE UNDER FEDERAL TORT CLAIMS ACT
(AGAINST DEFENDANT UNITED STATES OF AMERICA)**

251.    Plaintiffs repeat and incorporate by reference every allegation contained in the

preceding paragraphs as if fully set forth above.

252.    At all relevant times, Defendant United States, individually or through its agents,

servants, contractors, and/or employees undertook and endeavored to, and did provide

custodial care to people incarcerated at FMC Carswell including, but not limited to, the

Plaintiff.

253.    At all relevant times, Defendant United States acted negligently in its indifference

to Plaintiffs' safety.

254.    At all relevant times, Defendant United States hired correctional and

administrative employees at FMC Carswell, including Officer Brown, as well as

colleagues and supervisors of Officer Brown whose identity are currently unknown to

Plaintiff.

255.    At all relevant times, Defendant United States's employees were acting within the

scope of their employment, in their official uniforms during work hours, performing work

duties, when exercising custodial care, control, and supervision to Plaintiffs.

256.    At all relevant times, FMC Carswell personnel held themselves out to

incarcerated individuals as personnel with the ability and knowledge to carry out their

duties, provide due care, and to act in accordance with standards of reasonable care

common and acceptable in the community.

257.    At all relevant times and within the scope of their employment by Defendant

United States, the above-named and unknown staff, while working within their official

capacities at FMC Carswell, owed a duty to Plaintiffs while they were at FMC Carswell.

258.    It is Defendant United States's duty to maintain, operate, and control FMC

Carswell as a safe and secure space for persons in it, including, but not limited to,

Plaintiffs.

259.    In addition to a custodial duty owed to Plaintiffs, Defendant United States of

America was statutorily obligated under the Prison Rape Elimination Act and BOP policy

to protect prisoners from foreseeable harm that included the sexual abuse suffered by

A.G. and N.H.

260.    Defendant United States should have known that Officer Brown had a propensity

to sexually abuse inmates, due to past rumors and disciplinaries received at FMC

Carswell.

261.    Defendant United States should have known that Officer Brown acted

inappropriately with prisoners under his care at FMC Carswell.

262.    Defendant United States was on notice of the possibility that prisoners would be

sexually abused by corrections officers and other facility staff, through above-mentioned

investigations, articles, lawsuits, and reports.

263.    As such, there was a foreseeable risk that correctional officers would sexually

abuse Plaintiffs and others under their control.

264.    Despite actual and constructive notice of Officer Brown's abuse, agents, servants,

contractors, and/or employees of Defendant United States did not exercise reasonable

care or take reasonable available measures to abate the risk of sexual abuse to Plaintiffs, and to ensure their safety, in violation of federal regulations and BOP protocols.

265.    Despite actual and constructive notice of Officer Brown's abuse, Defendant United States failed to create and implement procedures, training, and supervision that would protect prisoners from the foreseeable risk of harm, including sexual abuse.

266.    Despite actual and constructive notice of Officer Brown's abuse, Defendant United States knew of or should have known of the risk posed to Plaintiffs and other prisoners that they would be sexually assaulted by employees such as Officer Brown.

267.    Despite actual and constructive notice of Officer Brown's abuse, Defendant United States failed to maintain its facilities in a manner to deter the possibility of sexual abuse, including the above-mentioned lack of video cameras and the availability of unmonitored and isolated spaces in the facility for which male officers could be alone with female prisoners.

268.    Due to Defendant United States's herein described acts and omissions, it breached its duty to protect Plaintiffs and other prisoners from the reasonably foreseeable harm of sexual abuse by its employees, including Officer Brown.

269.    Agents, servants, contractors, and/or employees of the United States did not possess the necessary skill to maintain safe and secure environment and protect Plaintiffs from foreseeable harm.

270.    Agents, servants, contractors, and/or employees of the United States neglected to apply the skill they did have.

271.    Agents, servants, contractors, and/or employees of the United States did not use reasonable care in applying the skill they had.

272.    Agents, servants, contractors, and/or employees of the United States mistreated Plaintiffs and/or were negligent in other ways that are documented in the relevant records and/or in ways of which Plaintiffs are not yet aware.

273.    Plaintiffs' injuries were inflicted solely through the carelessness, recklessness, gross negligence, negligence, and deliberate indifference of Defendant United States and its agents, servants, contractors, and/or employees, and through no fault or want of care or contributory negligence on the part of Plaintiffs.

274.    The failure of FMC Carswell personnel to prevent, investigate, or acknowledge Officer Brown's sexual abuse, served no legitimate policy purpose. On the contrary, FMC Carswell staff were required by mandatory BOP policies and federal regulations to immediately intervene and investigate when they learned of his suspected sexual abuse. Their failure to do so was patently outside of their discretionary function.

275.    Plaintiffs' injuries were direct and proximate consequences of Defendant United States' (a) failure to enforce zero-tolerance policy against sexually abusive conduct, 28 C.F.R. § 115.11; (b) failure to supervise, monitor, and surveil one-on-one physical contact between BOP personnel and incarcerated persons, 28 C.F.R. § 115.13; (c) decision to hire, retain, and promote BOP personnel who was suspected or alleged to have had improper sexual contact, 28 C.F.R. § 115.17; (d) punishment of victims through disciplinary or retaliatory measures rather than providing proper support and protection, 28 C.F.R. § 115.43; (e) failure to report suspicion or allegation of sexual abuse, 28 C.F.R. § 115.61; (f) failure to protect victims from retaliation after reporting sexual abuse, 28 C.F.R. § 115.67; (g) failure to promptly, thoroughly, and objectively investigate all

allegations or reports, 28 C.F.R. § 115.71(a); and (h) failure to discipline staff for sexual misconduct, 28 C.F.R. § 115.76.

276.    Defendant United States's above-described acts and omissions were a direct and proximate cause of Plaintiffs' injuries and damages herein.

## COUNT II – NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS CLAIM UNDER FEDERAL TORT CLAIMS ACT (AGAINST DEFENDANT UNITED STATES OF AMERICA)

277.    Plaintiffs repeat and incorporate by reference every allegation contained in the preceding paragraphs as if fully set forth above.

278.    The above-described acts and omissions of FMC Carswell personnel, acting as an agent of Defendant United States, constituted extreme and outrageous conduct.

279.    Defendant United States, individually or through its agents, servants, contractors, and/or employees, directly caused or disregarded a substantial probability of causing severe emotional distress to Plaintiffs.

280.    Defendant United States of America was negligent in its oversight and administration of FMC Carswell, which was a direct and proximate cause of Plaintiffs' injuries.

281.    The acts and omissions of Defendant United States, described above, physically endangered Plaintiffs and caused their injuries through the sexual abuse they suffered and caused debilitating emotional suffering. These acts and omissions constitute the tort of negligent infliction of emotional distress under the laws of the District of Columbia.

282.    Under the FTCA, Defendant United States is liable for the acts and omissions of its agents, servants, contractors, and/or employees that occurred within the scope of their employment as here.

283.    As a direct and proximate result of the foregoing, Plaintiffs suffered debilitating psychological trauma, excruciating pain and suffering, emotional distress, permanent and catastrophic psychological injuries, permanent physical ailments associated with psychological injuries, humiliation, fear, depression, anxiety, frustration, loss of enjoyment and pleasures of life, loss of quality of life, and offenses to their personal dignity, as well as attendant damages, both general and special, including, but not limited to, any past and future medical expenses and economic injuries.

284.    As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered serious harm including, without limitation, physical, psychological, emotional, mental, financial, and reputational harm, and therefore, Plaintiffs are entitled to recover damages in an amount to be determined at trial.

## COUNT III – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS CLAIM UNDER FEDERAL TORT CLAIMS ACT (AGAINST DEFENDANT UNITED STATES OF AMERICA)

285.    Plaintiffs repeat and incorporate by reference every allegation contained in the preceding paragraphs as if fully set forth above.

286.    Defendant United States's acts and omissions herein and the acts and omissions of its agents, servants, contractors, and/or employees constituted extreme and outrageous conduct, which caused N.H. ad A.G. severe emotional distress following sexual abuse they experienced.

287.    Defendant United States, individually or through its agents, servants, contractors, and/or employees, intended to cause, or were recklessly indifferent to the probability of causing, Plaintiffs severe emotional distress.

288.    Plaintiffs, in fact, suffered debilitating emotional suffering. Their emotional distress was so substantial and enduring that no reasonable person in a civilized society should be expected to endure it.

289.    Officer Brown engaged in extreme and outrageous conduct through violently raping A.G. and N.H. while they were incarcerated and entirely under the care and control of Defendant United States. He intended to cause them severe emotional distress, or was recklessly indifferent to the probability of causing such distress, when he sexually abused them while he was supposed to be providing custodial care.

290.    At all relevant times, Officer Brown was acting within the scope of his employment at FMC Carswell, and used his authority as a member of the facility's correctional staff to sexually assault Plaintiffs, while Plaintiffs did not have the ability to consent or withhold consent.

291.    Plaintiffs' injuries and damages were caused, in whole or in party, by intentional torts (*e.g.*, intentional infliction of emotional distress, gender violence, sexual assault, and battery) perpetrated by Officer Brown. Under 28 U.S.C. § 2680(h), Defendant United States is liable for the intentional torts committed by Officer Brown, and his abuse of his position of authority as a correctional officer and united manager, within the scope of his employment and under color of federal law.

292.    At all relevant times, Defendants United States individually or through its agents, servants, contractors, and/or employees including Officer Brown, were acting under color

of authority as "law enforcement officers" within the meaning of 28 U.S.C. § 2680(h). At all relevant times, Officer Brown supervised, disciplined, oversaw, monitored, controlled, directed, ordered, restrained, and imprisoned Plaintiff within the scope and course of his employment with Defendant United States. All BOP employees, are charged with maintaining security of the institution and staffs' correctional responsibilities precede all others required by this position and are performed on a regular and recurring basis.

293.     At all relevant times, Defendant United States individually or through its agents, servants, contractors, and/or employees including Officer Brown, used their authority as law enforcement officers to direct, order, restrain, force, overpower, intimidate, threaten, coerce, blackmail, harass, abuse, and assault Plaintiffs and to prevent them from disclosing the sexual assaults for fear of retaliation, victim-blaming or shaming, additional assaults, among others.

294.     Defendant United States is vicariously liable for the intentional torts committed upon A.G. and N.H. Thus, Plaintiffs bring this Claim for intentional infliction of emotional distress under the FTCA against the United States, based on the conduct of its officers including Officer Brown.

295.     As a result of FMC Carswell personnel's use and abuse of their positions of authority as "law enforcement officers" within the course and scope of their employment, and as a direct and proximate result of the foregoing, Plaintiffs suffered debilitating psychological trauma, excruciating pain and suffering, emotional distress, permanent and catastrophic psychological injuries, permanent physical ailments associated with psychological injuries, humiliation, fear, depression, anxiety, frustration, loss of enjoyment and pleasures of life, loss of quality of life, and offenses to their personal

dignity, as well as attendant damages, both general and special, including, but not limited to, any past and future medical expenses and economic injuries.

296.     As a direct and proximate result of Defendant's conduct, Plaintiffs have suffered serious harm including, without limitation, physical, psychological, emotional, mental, financial, and reputational harm, and therefore, Plaintiffs are entitled to recover damages in an amount to be determined at trial.

### COUNT IV – SEXUAL BATTERY UNDER FEDERAL TORT CLAIMS ACT (AGAINST DEFENDANT UNITED STATES OF AMERICA)

297.     Plaintiffs repeat and incorporate by reference every allegation contained in the preceding paragraphs as if fully set forth above.

298.     Officer Brown committed sexual battery on A.G. and N.H. It was impossible for A.G. and N.H. to provide consent under 18 U.S.C. § 2243(b), which constitutes a felony when a BOP employee knowingly engages "in a sexual act with another person who is 1) in official detention; and (2) under the custodial, supervisory, or disciplinary authority of the person so engaging."

299.     Officer Brown acted within the scope of his authority and employment as a federal employee in the administrative unit at FMC Carswell.

300.     A.G. and N.H. reasonably believed that Officer Brown was in a position of control or authority, and they did not have the ability to consent or not consent to sexual acts that he initiated.

301.     With the intent to cause harmful or offensive contact, Officer Brown subjected A.G. and N.H. to sexual acts to which they could not consent. These acts were deeply offensive to their personal dignity and would offend a person of ordinary sensitivity.

302.     These above-described acts and omissions were a direct and proximate cause of Plaintiffs' serious physical and emotional harm.

303.     As a direct and proximate result of the foregoing, Plaintiffs suffered debilitating psychological trauma, excruciating pain and suffering, emotional distress, permanent and catastrophic psychological injuries, permanent physical ailments associated with psychological injuries, humiliation, fear, depression, anxiety, frustration, loss of enjoyment and pleasures of life, loss of quality of life, and offenses to their personal dignity, as well as attendant damages, both general and special, including, but not limited to, any past and future medical expenses and economic injuries.

304.     As a direct and proximate result of Defendant's conduct, Plaintiffs have suffered serious harm including, without limitation, physical, psychological, emotional, mental, financial, and reputational harm, and therefore, Plaintiffs are entitled to recover damages in an amount to be determined at trial.

305.     Defendant United States of America is liable for the intentional torts committed Officer Brown, and his abuse of his position of authority as a correctional officer within the scope of his employment.

## COUNT V – SEXUAL ASSAULT UNDER FEDERAL TORT CLAIMS ACT
## (AGAINST DEFENDANT UNITED STATES OF AMERICA)

306.     Plaintiffs repeat and incorporate by reference every allegation contained in the preceding paragraphs as if fully set forth above.

307.     Plaintiffs bring this Claim under the FTCA for sexual assault against Defendant United States, based on the conduct of its officers including Officer Brown.

308.     Officer Brown subjected A.G. and N.H. to sexual acts with the intent to cause

harmful or offensive contact. His intentional torts caused A.G. and N.H. physical and

emotional injuries, and Defendant United States is liable for intentional torts perpetrated

by its agents within the scope of their employment.

309.     It was impossible for A.G. and N.H. to provide consent under 18 U.S.C. §

2243(b), which constitutes a felony when a BOP employee knowingly engages "in a

sexual act with another person who is 1) in official detention; and (2) under the custodial,

supervisory, or disciplinary authority of the person so engaging."

310.     Officer Brown acted within the scope of his authority and employment as a

federal employee in the medical unit at FMC Carswell.

311.     A.G. and N.H. reasonably believed that Officer Brown was in a position of

control or authority, and that they did not have the ability to consent or not consent to

sexual acts that he initiated.

312.     As a direct and proximate result of the foregoing, Plaintiffs suffered debilitating

psychological trauma, excruciating pain and suffering, emotional distress, permanent and

catastrophic psychological injuries, permanent physical ailments associated with

psychological injuries, humiliation, fear, depression, anxiety, frustration, loss of

enjoyment and pleasures of life, loss of quality of life, and offenses to their personal

dignity, as well as attendant damages, both general and special, including, but not limited

to, any past and future medical expenses and economic injuries.

313.     As a direct and proximate result of Defendant's conduct, Plaintiffs have suffered

serious harm including, without limitation, physical, psychological, emotional, mental,

financial, and reputational harm, and therefore, Plaintiffs are entitled to recover damages in an amount to be determined at trial.

314.    Defendant United States is liable for the intentional torts committed by Officer Brown, and his abuse of his position of authority as a correctional officer within the scope of his employment.

## COUNT IX – NEGLIGENT SUPERVISION UNDER FEDERAL TORT CLAIMS ACT (AGAINST DEFENDANT UNITED STATES OF AMERICA)

315.    Plaintiffs repeat and incorporate by reference every allegation contained in the preceding paragraphs as if fully set forth above.

316.    Defendant United States hired Officer Brown and other abusive employees, and allowed them to use their positions of power within the facility to exert influence over prisoners such as A.G. and N.H.

317.    Defendant United States knew that potential abusers such as Officer Brown would have the opportunity to be alone with female prisoners, particularly in secluded areas and areas without other facility personnel or video surveillance.

318.    Defendant United States failed to properly oversee and administer FMC Carswell, and failed to properly implement BOP and PREA policies that would have deterred sexual abuse such as that suffered by A.G. and N.H.

319.    Defendant United States had knowledge of the threat of future sexual abuse posed to prisoners as committed by facility staff, through the reports mentioned above and lawsuits.

320.     Defendant United States's knowledge of prior sexual abuse at FMC Carswell, as well as those specifically by Officer Brown, placed it on notice of employees' propensity to engage in sexually abusive behavior with prisoners such as A.G. and N.H.

321.     If Defendant United States had properly supervised employees, facility staff such as Officer Brown would not have been able to sexually abuse prisoners.

322.     If Defendant United States of America had conducted thorough investigations of reported employees, Officer Brown would not have been able to continue sexually abusing prisoners, including A.G. and N.H.

323.     If Defendant United States of America had tracked reports or data of reported employees, Officer Brown would not have been able to continue sexually abusing prisoners, including A.G. and N.H.

324.     Defendant United States was also negligent in allowing employees it knew previously committed sexual abuse to continue to safeguard and monitor a female population of prisoners.

325.     If Defendant United States of America had properly supervised and investigated employees such as Officer Brown and his supervisors, it would have learned of his propensity to commit sexual abuse.

326.     The above-described acts and omissions were a direct and proximate cause of Plaintiffs' serious physical and emotional harm.

**COUNT X - Trafficking Victims Protection Reauthorization Act ("TVPRA"),
18 U.S.C. § 1581, *et seq.*
(AGAINST DEFENDANT REESE)**

327.     Plaintiffs repeat and incorporate by reference every allegation contained in the preceding paragraphs as if fully set forth above.

328.    Congress passed the Trafficking Victims Protection Act and subsequent reauthorization acts ("TVPA") to combat domestic human trafficking.

329.    TVPA is a comprehensive statutory framework imposing both criminal and civil liability, *see* 18 U.S.C. § 1595, of persons engaging or attempting to engage or benefit from sexual exploitation and labor trafficking or obstructing anti-trafficking enforcement.

330.    The TVPA makes liable anyone who attempts to, conspires to, or actively "recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person; or . . . benefits, financially or by receiving anything of value, from participation in a [trafficking] venture" while knowing "that means of force, threats of force, fraud, coercion . . . will be used to cause the person to engage in a commercial sex act." 18 U.S.C. § 1591(a); 18 U.S.C. § 1594.

331.    "Coercion" means "threats of serious harm to or physical restraint against any person . . . any scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm to or physical restraint against any person" or "the abuse or threatened abuse of law or the legal process." 18 U.S.C. § 1591(e)(2).

332.    "Serious harm" means "any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity in order to avoid incurring that harm." 18 U.S.C. § 1591(e)(5).

333.    The term "abuse or threatened abuse of law or legal process" means the use or threatened use of a law or legal process, whether administrative, civil, or criminal, in any manner or for any purpose for which the law was not designed, in order to exert pressure

on another person to cause that person to take some action or refrain from taking some action. 18 U.S.C. § 1591(e)(1).

334.     A commercial sex act is "any sex act, on account of which anything of value is given to or received by any person." 18 U.S.C. § 1591(e)(3).

335.     Additionally, the TVPA punishes anyone who "knowingly provides or obtains the labor or services of a person by any one of, or by any combination of, the following means.

    a.  by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;

    b.  by means of serious harm or threats of serious harm to that person or another person;

    c.  by means of the abuse or threatened abuse of law or legal process; or

    d.  by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint." 18 U.S.C. § 1589(a).

336.     The TVPA makes liable anyone who knowingly benefits, financially or by receiving anything of value, from participation in a venture which has engaged in the providing or obtaining of labor or services by any of the means described in subsection (a), knowing or in reckless disregard of the fact that the venture has engaged in the providing or obtaining of labor or services by any of such means, shall be punished as provided in subsection (d). 18 U.S.C. § 1589(b).

337.     The term "abuse or threatened abuse of law or legal process" in the forced labor provision means "the use or threatened use of a law or legal process, whether

administrative, civil, or criminal, in any manner or for any purpose for which the law was not designed, in order to exert pressure on another person to cause that person to take some action or refrain from taking some action." 18 U.S.C. § 1589(c)(1).

338.     The term "serious harm" means "any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm." 18 U.S.C. § 1589(c)(12).

339.     The TVPA also punishes anyone who "obstructs, attempts to obstruct, or in any way interferes with or prevents the enforcement of this section," 18 U.S.C. § 1591(d).

340.     The TVPA allows for civil liability as set forth in 18 U.S.C. § 1595(a).

341.     An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorneys' fees. 18 U.S.C. § 1595(a).

342.     Congress grants a plaintiff up to ten years in which to bring a civil action under 18 U.S.C. § 1595(c). Officer Brown made Plaintiffs engage in sex acts through force and coercion.

343.     Defendant Reese, as Chief of the Office of Internal Affairs, knew or should have known that Officer Brown had engaged in commercial sex acts with the Plaintiffs in

violation of the TVPA, and had a duty to protect prisoners, such as A.G. and N.H. from reasonably foreseeable predators such as Officer Brown.

344.    By her acts and omissions in failing to meet these duties, Defendant Reese benefitted through continued employment.

345.    Defendant Reese participated in a venture and facilitated the harboring and transportation of Plaintiff for purposes of sex induced by force, fraud, or coercion.

346.    Defendant Reese benefitted financially through continuing employment and advancement when she, through her own actions and those she directed in her office, ignored the conditions that led to Officer Brown's persistent abuse, and otherwise benefitted from facilitating this behavior that kept him in his role on the facility's medical staff.

347.    This conduct has caused Plaintiffs serious harm including, without limitation, physical, psychological, emotional, financial, and reputational harm and they have a claim for damages for such violations under 18 U.S.C. § 1591, 18 U.S.C. § 1595.


**PRAYER FOR RELIEF**

A.G. and N.H. pray for judgment against Defendants, and each of them, as follows:

348.    An award of compensatory, punitive, and nominal damages to each named Plaintiff in an amount to be determined at trial;

349.    An award to Plaintiffs of the costs of this suit and reasonable attorneys' fees and litigation expenses; and

350.    For such other and further relief as this Court may deem just and proper.

Dated: July 14 2025

Respectfully submitted by,


*/s/ Deborah M. Golden*
Deborah M. Golden
DC Bar # 470-578

bex kolins
DC Bar # 90035779
*Application to DDC admission forthcoming*

The Law Office of Deborah M. Golden
700 Pennsylvania Ave. SE, 2nd Floor
Washington, DC 20003
202-630-0332
dgolden@debgoldenlaw.com